## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**THOMAS C. SIEFERT,**

      **Plaintiff,**

  **v.**                                 **Civil Action 2:19-cv-1344**
                                                        **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Thomas C. Siefert ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for period of disability and disability insurance benefits.  This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 12), Plaintiff's Reply Memorandum (ECF No. 3), and the administrative record (ECF No. 8).  For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner of Social Security's decision is **AFFIRMED**.

## I.        BACKGROUND

Plaintiff filed his application for Title II Social Security Benefits on May 14, 2013, alleging, after amendment, that he had been disabled since May 16, 2013.  (R. 193, 205.)  On December 8, 2014, following administrative denials of Plaintiff's application initially and on reconsideration, a hearing was held before Administrative Law Judge Jeannine Lesperance (the "ALJ").  (*Id.* at 37–86.)  On March 9, 2015, the ALJ issued a decision finding that Plaintiff was

not disabled within the meaning of the Social Security Act.  (*Id.* at 12–31.)  After the Appeals

Council denied Plaintiff's request for review and adopted the ALJ's decision as the

Commissioner's final decision (*Id.* at 626–28), Plaintiff commenced an action in this Court,

which remanded the case to the Appeals Council for reconsideration of whether Plaintiff's

impairments met the criteria for disability under Listing 1.02A of 20 C.F.R. Part 404, Subpart P,

Appendix 1.  *Siefert v. Comm'r of Soc. Sec.*, No. 2:16-cv-162, 2017 WL 2828733 (S.D. Ohio

June 30, 2017), *report and recommendation adopted*, 2017 WL 4083583 (S.D. Ohio Sept. 14,

2017).

Following remand, a second hearing was held before the same ALJ on December 4,

2018.  (R. 554–98.)  Plaintiff, represented by council, appeared and testified at the hearing.  The

ALJ heard additional testimony from a vocational expert, Connie O'Brien (the "VE"), and an

independent medical expert, Jonathan Nusbaum, M.D. (the "ME").  On January 11, 2019, the

ALJ issued a second decision finding that Plaintiff was not disabled within the meaning of the

Social Security Act.  (*Id.* at 398–446.)  On March 13, 2019, the ALJ's decision became the

Commissioner's final decision.  (*Id.* at 396.)  Plaintiff then timely commenced the instant action.

(ECF No. 1.)

In his Statement of Errors (ECF No. 11), Plaintiff raises two contentions of error.  First,

he contends that the ALJ failed to properly evaluate the opinions of his primary care physician,

Dr. Joseph Trapp, D.O.  Second, Plaintiff asserts that the ALJ's RFC is not supported by

substantial evidence.

## II.    THE ALJ'S DECISION

On January 11, 2019, the ALJ issued a second decision finding that Plaintiff was not

disabled within the meaning of the Social Security Act.  (*Id.* at 398–446.)  At step one of the

sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially

gainful activity since May 16, 2013, the alleged disability onset date, through the date last

insured of June 30, 2018.  (*Id.* at 400.)  The ALJ found that Plaintiff had the severe impairments

of right knee osteoarthritis, obesity, and chronic venous insufficiency.  (*Id.* at 401.)  She further

found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (*Id.* at 416.)  At step four of the sequential process, the ALJ set forth Plaintiff's

RFC as follows:

> After careful consideration of the entire record, I find that from the amended alleged
> onset date of disability through the date last insured, the claimant has the residual
> functional capacity to perform light work as defined in 20 CFR 404.1567(b).
> Climbing ramps and stairs, crouching, and kneeling, are each limited to no more
> than occasionally.  He cannot climb ladders, ropes, and scaffolds, and crawl, and
> must avoid all exposure to hazards such as moving mechanical parts and
> unprotected heights.

(*Id.* at 420.)

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the
    criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20
    C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his
    or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual
    functional capacity, can the claimant perform other work available in the national
    economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step five of the sequential process, the ALJ, relying on the VE's testimony, found that considering Plaintiff's age, education, past work experience, and RFC, he can perform his past relevant work as a marine and vehicle salesperson and a marketing executive.  (*Id.* at 445.)  The ALJ further noted that even if she had adopted the more restrictive RFC opined by Dr. Nusbaum, Plaintiff could still perform these positions as he had actually performed them.  (*Id.*)

The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.* at 445–46.)

### III.    RECORD EVIDENCE

Plaintiff applied for disability benefits on May 14, 2013, initially alleging an onset date of May 10, 2010, but later amending his alleged onset date to May 16, 2013.

**A.    Dr. William H. Batten, M.D.**

The record contains some records prior to Plaintiff's May 16, 2013 alleged onset date, including treatment records from treating physician Dr. William H. Batten, M.D., a genitourinary specialist.  Dr. Batten's examination notes, dated between June 2010 and July 2012, revealed that upon physical examination, Plaintiff displayed no musculoskeletal abnormalities, displayed normal mobility, and did not require a wheelchair, cane, or walker.  (R. at 271, 273, 275, 278.)

**B.    2010 and 2013 X-Rays**

In August 2010, x-rays of Plaintiff's knees were taken.  The x-ray of Plaintiff's left knee was unremarkable.  The x-ray of his right knee showed "some spurring about the lateral compartment," as well as some spurring at the patellofemoral articulation with a diagnosis of "[d]egenerative change of the right knee, particularly in the lateral compartment and the patellofemoral articulation."  (R. at 329.)

Another x-ray of Plaintiff's right knee was taken after his alleged onset date, on August 23, 2013.  That x-ray revealed that Plaintiff had moderate osteoarthritis that had "slightly

progressed since 2010" and a "[s]mall supratellar joint effusion." (R. at 339.) The record contains no other x-rays or other diagnostic imaging of Plaintiff's right knee.

## C. Primary Care Physician Dr. Joseph Trapp, D.O.

The record also contains numerous treatment notes from Plaintiff's primary care physician, Dr. Trapp.

On January 10, 2013, Dr. Trapp noted that Plaintiff displayed "normal gait and station" and denied sore muscles, neck pain, or back pain. (R. at 314.) On February 7, 2013, Dr. Trapp noted that Plaintiff "[w]alks with a cane." (R. at 309.) On February 22, 2013, and April 3, 2013, Dr. Trapp noted that Plaintiff displayed "[n]ormal gait and station." (R. at 303, 306, 346.)

On June 23, 2013, Dr. Trapp noted "[r]egional soft tissue swelling of both [of Plaintiff's] lower extremities," but noted that he was in "no acute distress" and upon examination of Plaintiff's right knee observed "no tenderness on palpation," his "[k]nee motion was normal," and "[n]o pain was elicited by motion of the knee." (R. at 330–31.) Dr. Trapp diagnosed venous insufficiency and osteoarthritis of the right knee and counseled Plaintiff to engage in "regular exercise and lose weight." (R. at 331–32.)

On September 30, 2013, Dr. Trapp completed a physical residual functional capacity form. (R. at 333–338.) He opined that Plaintiff could occasionally lift or carry up to 10 pounds, but never lift or carry weight above 10 pounds. Dr. Trapp further opined that Plaintiff could only sit for 30 minutes at a time, stand for 10 minutes at a time with a cane, walk 5 minutes at a time with a cane, stand only 30 minutes total out of an 8-hour workday, walk 25 minutes total out of an 8-hour workday, and must lay down 4 hours out of the 8-hour workday. Dr. Trapp also checked a box indicating that Plaintiff required a cane to ambulate and could only walk 15 feet without a cane. In addition, Dr. Trapp checked boxes reflecting that Plaintiff could never reach, handle, finger, feel, or push/pull with his right hand and could only occasionally perform these

duties with his left hand, explaining that Plaintiff "must use right hand continuously on cane when walking or standing." (R. at 335.) Dr. Trapp also opined that Plaintiff could only occasionally use right foot controls and that his use of left foot controls was limited to frequently. He opined that Plaintiff could occasionally climb stairs and ramps and balance with a cane, but could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. Dr. Trapp checked boxes reflecting that Plaintiff did not need two canes or a walker, that he could travel without a companion for assistance, and that he could occasionally operate a motor vehicle, but could not perform activities like shopping or using public transportation.

On June 20, 2014, Dr. Trapp prescribed Plaintiff a cane "not a 4-prong." (R. at 343.)

On August 21, 2014, Dr. Trapp completed a form entitled "Listing § 1.02A – Major Dysfunction of a Weight Bearing Joint." (R. at 340–41.) Dr. Trapp opined that Plaintiff satisfied Listing 1.02A because he experienced swelling and painful ambulation. He checked a box reflecting that Plaintiff had limitation of his affective joint, adding below that Plaintiff could not fully bend or straighten his right knee. Dr. Trapp also checked boxes indicating that Plaintiff could not walk a block at reasonable pace on rough or uneven surfaces, that he could not use public transportation, that he could not carry out routine activities such as grocery and clothes shopping and banking, and that he could not climb several stairs at a reasonable pace with use of a single hand rail. Dr. Trapp added that Plaintiff needed a cane to ambulate.

In January, June, September, and October 2014, Dr. Trapp examined Plaintiff's right knee. Plaintiff's knee was not tender upon palpation, his knee motion was normal, and no pain was elicited by motion. Dr. Trapp advised Plaintiff on cessation of tobacco use, regular exercise, weight loss, and proper diet. Dr. Trapp diagnosed venous insufficiency and osteoarthritis of the right knee, which was stable. (R. at 540–41, 543–44.) On October 23, 2014, Dr. Trapp

6

prescribed Plaintiff a walker. (R. at 394.) Dr. Trapp made similar observations throughout 2015. (R. at 998–1012.) In October 2015, Dr. Trapp discussed scheduling Plaintiff for an injection of Synvisc, an injection that supplements the fluid in a knee to lubricate and cushion the joint, and in July 2015, Dr. Trapp noted that the treatment plan involved scheduling an appointment for Plaintiff to get such an injection. (R. at 1000, 1002.)

Plaintiff saw Dr. Trapp for three visits in 2016 and five visits in 2017. Treatment notes from these visits in 2016 and 2017 reflect that Plaintiff's knee was not tender upon palpation, his knee motion was normal, and no pain was elicited by motion. (R. at 981–88, 1130–1141.) Dr. Trapp diagnosed venous insufficiency and osteoarthritis of the right knee, which was stable and continued to counsel Plaintiff on cessation of tobacco use, regular exercise, weight loss, and proper diet. (*Id.*) In October 2017, Dr. Trapp noted that he was checking with Plaintiff's insurance regarding scheduling an appointment for an injection of Synvisc. (R. at 1132.)

The record also contains treatment records for three visits to Dr. Trapp in 2018. In February 2018, Dr. Trapp first noted that Plaintiff was "taking Excedrin [over-the-counter] for intermittent knee pain" and also that Plaintiff "refuse[d] orthopedics appointment for his knee." (R. at 1126–28.) His examination notes reflect that Plaintiff was in no acute distress, that he had normal knee motion, and that no pain was elicited by motion. In March 2018, Plaintiff reported to Dr. Trapp for treatment of hypertension. During that visit, Dr. Trapp observed that Plaintiff had no swelling in either of his lower extremities (R. at 1124–1125), but his notes do not reflect that he otherwise examined Plaintiff's right knee. In June 2018, as in February 2018, Dr. Trapp noted that Plaintiff was "taking Excedrin [over-the-counter] for intermittent knee pain" and also that Plaintiff "refuse[d] orthopedics appointment for his knee." (R. at 1121–23.) Dr. Trapp's examination of Plaintiff's knee in June 2018 again revealed normal knee motion and that no pain

was elicited by motion.  Dr. Trapp diagnosed venous insufficiency and "[l]ocalized primary

osteoarthritis of right knee which is stable."  (R. at 1123.)  As he had done in the past, he

continued to counsel Plaintiff on regular exercise, weight loss, cessation of tobacco use, and

proper diet.

> In December 2018, Dr. Trapp drafted the following letter relating to Plaintiff's condition:
>
> Mr. Seifert has a long standing history of osteoarthritis of the right knee, treated by myself primarily, starting in 2013.  Evidence of arthritis of the knee dates back to August 23, 2010.
>
> Mr. Siefert has shown progression of his arthritis per x-ray on August 21, 2013 showing more moderate osteoarthritis.  He has tried viscosupplementation injections and cortisone injections over the past several years without much success.  He states he missed several days at work in 2013 and sometimes leaving work at noon due to pain and discomfort.  Mr. Siefert also states he missed on average three (3) days a week at that time due to the fear of falling and frequently used a cane at work.
>
> Due to the arthritis he was forced to stop working for the past several years and still uses a walker outside the home and a cane to this day.
>
> He is most recently being treated with Mobic, an anti-inflammatory, with minimal relief of his pain.  He has quit driving, and he is mostly homebound at this time.

(R. at 1256.)

## D.    Fairfield Healthcare Records

In January 2015, Plaintiff sustained a wound while fixing a tractor that became infected,

prompting Plaintiff to seek wound care treatment from Wound Clinic at Fairfield Medical

Hospital.  (R. at 460.)  He was observed to be in no apparent distress, prescribed antibiotics, and

educated on compression, cleaning, and changing the dressing on his wound.  Plaintiff also

reported smoking and drinking 16 beers per day, and was advised to smoke less or quit, but

Plaintiff reported that he did not want to quit.  (R. at 477–79.)  On January 15, 2015, Plaintiff

complained of "intermittent" "joint swelling and pain," but was observed to be in no apparent

distress.  (R. at 961.)  Thereafter, Plaintiff sought regular wound care treatment, and until July

2015, reported only mild pain upon palpation around the wound in his left extremity.  On July 2,

2015, however, Plaintiff's "main complaint [was] pain in right knee," which Plaintiff advised

was "awaiting a replacement" and was observed to be swollen.  (R. at 832.)  Plaintiff was

observed to be in no apparent distress and acknowledged that he was not wearing compression

stockings as directed.  (*Id.*)  Approximately two weeks later, on July 23, 2015, it was observed

that Plaintiff's "r[igh]t knee [was] better."  (R. at 840.)  Plaintiff was again observed to be in "no

apparent distress," he was not wearing his compression stockings as directed, and he reported

only "mild" pain in his left lower extremity, rating it at a 0/10.  (R. at 840, 845.)  In August and

September 2015, it was again noted that Plaintiff was in no acute distress and that he was not

wearing his compression stockings as directed.  (R. at 813–14, 819.)

 In November 2015, Plaintiff underwent laser ablation to treat varicose veins and a

chronic venous stasis ulcer in his left lower extremity.

### E.   Mental Health Treatment Records

 On June 14, 2013, Dr. Kevin J. Edwards, PhD., who treated Plaintiff for mental health

issues "for about 18 sessions" opined that Plaintiff "suffers mild symptoms" from his mental

health diagnoses and that his alcohol dependence complicates his treatment progress.  (R. at

319.)  Dr. Edwards noted that Plaintiff reported "performing all personal care, scheduling of

appointment and driving independently," and also that Plaintiff "maintained his home and

performed household chores as physically able."  (*Id.*)  Dr. Edwards continued to see Plaintiff for

a few more sessions.  In August 2013, Plaintiff continued "to talk about disability and how much

he paid into the system and thus deserves the allowance," and Dr. Edwards discussed with

Plaintiff "his need and desire to be honest in the assessment of his functional abilities."  (R. at

362.)  In September 2013, Dr. Edwards noted that Plaintiff continued to complain of financial

problems and that they discussed options such as selling his business.  Dr. Edwards further noted

that Plaintiff continues to smoke, drink, overeat, and not exercise despite his efforts to get him to stop.  (R. at 363.)  In November and December 2013, Plaintiff complained of severe depression and anxiety, but Dr. Edwards opined that Plaintiff was not depressed or anxious to the extent that he claimed and noted that Plaintiff was "essentially arguing that he had to be anxious and depressed."  (R. at 365–66.)

Plaintiff stopped receiving mental health treatment from Dr. Edwards in December 2013 and began treatment with a counselor, Annetta Macedonia, LPC, in August 2014.  In October 2014, two months after Plaintiff's initial visit, Ms. Macedonia drafted a letter in which she stated that Plaintiff reported that his anxiety was so unstable that he was unable to leave his home at times.  She also stated that Plaintiff appeared "to be in a great deal of pain from his knee."  (R. at 391.)  Ms. Macedonia noted that Plaintiff walked with a cane, and that in two months since their initial session, "[h]is physical condition seems to have worsened" as "evidenced by [Plaintiff's] inability to rise from the chair, without [her] assistance" at the conclusion of their 60-minute sessions.  (*Id*.)  Approximately three years later, in October 2017, Ms. Macedonia drafted a letter in which she indicated that Plaintiff's mental condition had worsened and made the following statement regarding Plaintiff's physical condition:

> Mr. Seifert continues to be in a great deal of pain from both his right knee and his lower left leg from an injury after falling.  He is gingerly walking with a cane and has a great deal of difficulty getting up after our sessions, which last approximately 60 minutes.  His physical condition has not improved since our initial visit.  This is evidenced by his inability to rise from the chair, without my assistance, at the conclusion of our sessions.  Also, his condition has restricted him from participating in all of the activities that in the past gave him self-confidence, a sense of self-worth, and self-satisfaction.

(R. at 1027.)  Approximately a year later, in October 2018, Ms. Macedonia drafted yet another letter in which she made the following statements about Plaintiff's physical condition:

> His family physician is monitoring his physical condition and medications.

10

> Mr. Seifert appears to be in a great deal of pain from his knee and from an injury to his leg after falling several months ago. He is now requiring the aid of two walking canes and has a great deal of difficulty getting up after our sessions, which last approximately 50 minutes. His physical condition seems to have worsened over this time period. This is evidenced by his slow and guarded gate [*sic*]; by his inability to rise from the chair, without my assistance, and by the fact that he no longer drives himself to my office.

(R. at 1250.)

## F. State-Agency Reviewing Physicians

State-Agency reviewing physician Dr. Leon D. Hughes, M.D., reviewed Plaintiff's records at the initial level and rendered an opinion on July 3, 2013. Dr. Hughes opined that Plaintiff could do a range of light work with the following postural limitations: occasional climbing ramps/stairs; never climbing ladders/ropes/scaffolds; and frequent kneeling, crouching, and crawling. Dr. Hughes commented that it was "unclear why [Plaintiff is] using a cane when [his] gait and station is [within normal limits]." (R. at 100.) Dr. Hughes found Plaintiff's allegations to be only partially credible, citing his significant activities of daily living, the lack of record evidence demonstrating impairment in gait/station, and his treatment other than medication. (R. at 98.)

On September 16, 2013, state-agency physician Dr. Elizabeth Das, M.D., rendered an opinion at the reconsideration level. Dr. Das noted that Plaintiff had reported using a cane for three years and also observed that the record reflected that Plaintiff has normal gait, normal musculoskeletal exams, and normal neuro exams. (R. at 108.) Like Dr. Hughes, Dr. Das likewise found Plaintiff's allegations to be only partly credible. (R. at 110.) Dr. Das, however, concluded that Plaintiff was less limited than Dr. Hughes opined, concluding that Plaintiff could perform work at the medium level of exertion with the following postural limitations: frequent climbing ramps/stairs; frequent climbing ladders/ropes/scaffolds; frequent kneeling; frequent crouching; and frequent crawling. (R. at 111–12.)

**G.    Medical Expert Nusbaum**

Medical Expert Jonathan Nusbaum, M.D., testified at the December 4, 2018 hearing.  (R. at 554–598.)  Dr. Nusbaum testified that notwithstanding Dr. Trapp's "progressive opinion," the record did not contain "progressive evidence" following the August 2013 x-ray report to support his statements.  (R. at 564–65.)  He concluded that Plaintiff did not meet or equal Listing 1.02. Dr. Nusbaum acknowledged that although the 2013 x-ray showed progression from the 2010 x-ray, the 2013 x-ray's findings were "mild to moderate."  (R. at 561.)

Dr. Nusbaum testified that although it was reasonable to conclude that venous insufficiency together with Plaintiff's other symptoms might require the use of a cane, the record contained insufficient evidence from which he could conclude that Plaintiff might require a walker.  (R. at 570–71.)

Dr. Nusbaum opined that as of June 2013, Plaintiff would have the following limitations: lifting 10 pounds occasionally and five pounds frequently; sitting two hours at a time, a total of six hours in an eight-hour work day; stand for no more than an hour at a time, a total of three hours in an eight-hour work day; walking limited to 15 minutes at a time and a total of two hours in an eight-hour work day; as a result of his knee issues, stooping, squatting, crouching, and crawling all would be limited to less than occasional, defined as less than 10% of the time; and no climbing ladders or stairs.  (R. at 573.)  Upon cross-examination, Dr. Nusbaum testified that he did not believe the record supported excessive absenteeism.  (R. at 574.)

**H.    The VE's Testimony**

Vocational expert Connie O'Brien (the "VE") also testified at the December 4, 2018 hearing.  When asked whether a hypothetical individual with the RFC the ALJ ultimately assessed could perform any of Plaintiff's past work as actually or generally performed, the VE

testified that such an individual could perform the positions of retail sales manager, marine salesperson, marketing executive, and vehicle salesperson. (R. at 577, 590.)

The VE further testified that if the limitations Dr. Nusbaum opined were adopted, the hypothetical individual could still perform Plaintiff's past positions of retail manager, marketing executive, vehicle sales, and marine sales as those positions were actually performed by Plaintiff. (R. at 591.)

Upon cross-examination from Plaintiff's attorney, the VE testified that if the individual was also required to lay down during the workday for two-to-four hours or elevate their feet for two hours, no work would be available in the competitive work setting. (R. at 593–94.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

13

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.     ANALYSIS

As set forth above, Plaintiff raises the following two contentions of error: (1) the ALJ failed to properly evaluate the opinions of his primary care physician, Dr. Trapp; and (2) the ALJ's RFC is not supported by substantial evidence. The undersigned considers these contentions of error in turn.

**A.     The ALJ did not err in her evaluation of the opinions of Plaintiff's primary care physician, Dr. Joseph Trapp, D.O.**

An ALJ must consider all medical opinions that he receives in evaluating a claimant's case. 20 C.F.R. §§ 404.1527(c), 416.927(c). When a treating physician's opinion is submitted, the ALJ generally gives deference to it "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Blakley*, 581 F.3d at 406 (internal quotations omitted). If the treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques

14

and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

If the ALJ does not assign controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating physician's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [a claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Plaintiff argues that the ALJ erred in rejecting Dr. Trapp's opinions because his opinions "are both well supported and not inconsistent with other substantial evidence." (Pl.'s Statement of Errors 6, ECF No. 11.) Plaintiff further maintains that the ALJ erred in failing "to provide 'good reasons' for granting less than controlling weight" and also failed to

15

properly apply the factors set forth in § 404.1527(c). (*Id*. at 9, 12.)

The ALJ provides the following lengthy discussion in support of her rejection of Dr. Trapp's opinions:

> The opinions of the claimant's primary care physician are entitled to no weight in assessing his physical functional limitations, restrictions, and residual functional capacity from the amended alleged onset date of disability through the date last insured (Exhibits 7F/1-6, 9F1-2, 10F/2, 15F, and 28F/2). As noted above, Dr. Nusbaum testified that there is no objective medical evidence documenting that the claimant requires use of a walker. Although Dr. Nusbaum testified that the evidence could possibly support that the claimant's use of a cane is medically necessary, he did not include usage of a handheld ambulatory aid in the physical functional limitations and restrictions he assessed. These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant repeatedly presented as well appearing (Exhibits 16F/6, 18F/7, 11, 14,16, 20, 22, 25, 33, and 35, and 24F/6, 11, 14, and 53). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant had good result from his November 2015 ablation procedure, with no need to return for further treatment after December 2015 (Exhibit 16F/2). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant does not experience claudication, deep vein thrombosis, and peripheral arterial disease (Exhibits 16F/7, 17F/7 and 21, and 18F/42 and 45). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant has normal ankle brachial index of 1.24 on the left and 1.25 on the right (Exhibit 17F/23). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant did not demonstrate muscle atrophy, numbness, paresthesia, spasm, tingling or weakness, or extremity edema or deformity at different times (Exhibit 3F/3, 6, 9 and 14). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant repeatedly had normal musculoskeletal and neurological examinations (Exhibits 1F/2, 4, 7, 11, 13, and 15, 16F/5-6, 17F/85, 105, 113, 124, 152, 158, and 166, 18F/7, 10, 13, 16, 19, 22-23, 28, 30, 32, and 35, and 24F/5, 8, 10, 14, 50, 52, and 59). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant did not require any prescribed ambulatory aid in May 2013 (Exhibit 7E/7). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant had normal gait and station at different times (Exhibit 3F/3, 6 and 14). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant's right knee was repeatedly stable with normal range of motion (Exhibits 6F/2, 13F/6, 9, 12, 15 and 18, 18F/9, 11-12, 14-15, 17-18, 20-21, 23-24, 26-27, 33-34, and 36-37, and 24F/6-7, 11-12, 15-16, 53-

54, and 60). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant reported only intermittent right knee pain in February and June 2018 (Exhibit 24F/5 and 10). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that this source did not refer the claimant for additional diagnostic imaging results of his right knee after August 2013. These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents only one instance of the claimant receiving a right knee injection, in November 2017 (Exhibit 24F/13). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that this source did not refer the claimant to an orthopedist until June 2018, less than a month prior to the date last insured, and the claimant notably refused the referral (Exhibit 24F/7). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the most recent diagnostic imaging results reflect only slight progression of the claimant's right knee degenerative changes since 2010 (Exhibit 8F). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant repeatedly denied back and neck pain (Exhibit 3F/3, 6, 9 and 14). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant had normal x-ray results of the chest and left ankle (Exhibits 5F/5 and 8, and 22F/3 and 6). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant repeatedly had negative and normal cardiovascular, endocrinal, gastrointestinal, genitourinary, and respiratory findings, including chest and lungs clear to auscultation, equal and normal breath sounds, and no abdominal and chest pain, claudication, constipation, cough, diarrhea, dizziness, goiters, heartburn, nausea, palpitations, rales, rhonchi, shortness of breath, syncope, vertigo, vomiting, and wheezing (Exhibits 3F/3, 5-6, 9 and 14, 6F/1, 13F/5-6, 8-9, 11-12, 14-15 and 17-18, 16F/5, 17F/152, 18F/7-8, 10-11, 13-14, 16-17, 19-20, 22-23, 25-26, 28-33, and 35-36, and 24F/5-6, 8-11, 14-15, 50, 52, 55, 57, and 59-60). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant's physical impairments and related symptoms are not sufficiently severe to preclude him from engaging in strenuous activities such as repairing tractors (Exhibit 17F/9). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant's left lower extremity wound, which had onset in January 2015 (Exhibit 7F/153, 156, and 164), resolved entirely by September 2015 (Exhibit 17F/11). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant prepares meals on a daily basis and regularly performs household chores and cleaning including dishes, laundry and loading the dishwasher (Exhibits 4F and 7E/2-3). These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant cared for his elderly mother from the amended alleged onset date of disability until she passed away in May 2014, including cooking for and feeding her and cleaning

her potty chair (Exhibit 7E/2 and testimony).  These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant also cares for two cats and dogs, including feeding them and letting the dogs outside (Exhibit 7E/2 and testimony).  These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant drives multiple times a week and receives rides from others to places he needs to go (Exhibits 4F and 7E/4, and testimony).  These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant testified to picking up and driving a neighbor to places.  These opinions are inconsistent with and unsupported by the totality of the evidence, as discussed above, which documents that the claimant regularly runs errands such as taking money to banks and going to the post office (Exhibit 16E/2, and testimony).  This evidence does not reasonably justify greater physical functional limitations and restrictions, and could support a determination that the claimant is less physically limited than set forth above from the amended alleged onset date of disability through the date last insured. Additionally, I note that this source is a doctor of osteopathic medicine with certification in family medicine (Exhibit 29F/3-4).  Therefore, I find that Dr. Nusbaum as a Board Certified General Surgeon (Exhibit 21F), is more qualified by training and experiencing in opining as to the claimant's physical functional limitations, restrictions, and residual functional capacity than this source. Accordingly, the opinions of the claimant's primary care physician are entitled to no weight in assessing his physical functional limitations, restrictions and residual functional capacity from the amended alleged onset date of disability through the date last insured.

(R. at 428–30.)  The ALJ provided a similarly lengthy discussion in support of her conclusion that Plaintiff did not meet or equal Listing 1.02 notwithstanding Dr. Trapp's opinion to the contrary.  (*See* R. at 416–17 (concluding that Plaintiff does not meet or equal Listing 1.02A "as there is no evidence documenting gross anatomical deformity, joint space narrowing, bony destruction, or ankylosis," citing, among other substantial evidence, Dr. Nusbaum's testimony that the moderate findings on the 2013 x-ray do not satisfy the listing requirements and that the record contains no evidence documenting impingement or that Plaintiff requires two crutches or canes or a walker to ambulate effectively).)

The Court finds no error with the ALJ's consideration and weighing of Dr. Trapp's opinions.  The ALJ properly considered that Dr. Trapp was Plaintiff's primary care physician

and that he is a doctor of osteopathic medicine with certification in family medicine, and the

ALJ's detailed discussion of Dr. Trapp's treatment records reflects that she also considered the

nature and extent of Plaintiff's treatment relationship with Dr. Trapp. *See Wilson*, 378 F.3d at

544. Moreover, the ALJ found that Dr. Trapp's opinions were inconsistent with and unsupported

by a totality of the record evidence, including Dr. Trapp's own treatment notes and

recommendations of only conservative treatment. The Court also notes that none of the other

sources who offered opinions relating to Plaintiff's exertional limits (Drs. Hughes, Das, and

Nusbaum, all of whom had access to the entire record at the time they rendered their opinions)

offered opinions supporting or consistent with Dr. Trapp's extreme opinions. *See Blakley*, 581

F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)) ("[I]t is an error to give

an opinion controlling weight simply because it is the opinion of a treating source if . . . it is

inconsistent the with other substantial evidence in the case record."); 20 C.F.R.

§§ 404.1527(c)(2)–(4) (providing that more weight will be given to medical opinions that are

consistent with the record as a whole and supported by medical findings); §§ 416.927(c)(2)–(4)

(same).

Plaintiff's arguments to the contrary are unavailing. First, Plaintiff disputes the ALJ's

findings, arguing that Dr. Trapp's opined limitations are supported by "objective medical

imaging and 10 years of examinations and treatment notes." (Pl.'s Statement of Errors 11–12,

ECF No. 11.) But Plaintiff fails to offer any discussion beyond this conclusory assertion. To the

contrary, as the ALJ observed, over the years he treated Plaintiff, Dr. Trapp repeatedly noted that

Plaintiff was in no acute distress, he described Plaintiff's right-knee osteoarthritis as stable, and

upon examination, observed that Plaintiff had normal knee motion. (*See also* R. at 840 (Plaintiff

reported to his treatment providers at Fairfield Medical Hospital in July 2015 that his "r[igh]t

knee was better.").)  In addition, the 2013 x-ray of Plaintiff's right knee shows only moderate osteoarthritis that had "slightly progressed" since 2010, and neither Dr. Trapp, nor any other physician who treated Plaintiff, referred him for additional diagnostic testing.  (R. at 339.)  And in 2018, Dr. Trapp first noted that Plaintiff had begun "taking Excedrin [over-the-counter] for *intermittent* knee pain" and that he had "refuse[d] orthopedics appointment for his knee."  (R. at 1121–25; 1126–28 (emphasis added).)  *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x, 719, 727 (6th Cir. 2013) (minimal or lack of treatment is valid reason to discount severity); *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 931 (6th Cir. 2007) ("The ALJ properly considered as relevant the fact that [the claimant's] medical records did not indicate that [claimant] received significant treatment . . . during the relevant time period."); *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (concluding that ALJ reasonably discounted a doctor's opined limitations where, among other things, the claimant was receiving conservative treatment).

Plaintiff's next assertion—that Dr. Trapp's opinions are consistent with the record in view of the letters Plaintiff's mental health counselor Ms. Macedonia drafted—is equally unpersuasive.  As a threshold matter, the ALJ concluded that Ms. Macedonia's statements regarding Plaintiff's physical function are entitled to "no weight," a determination Plaintiff has not challenged.  (R. at 430–31.)  Regardless, even assuming Ms. Macedonia's statements are consistent with Dr. Trapp's opinions does not mean that Dr. Trapp's opinions must be credited.  Rather, where the factual record could support two different conclusions, "the law obligates the court to affirm the ALJ's decision, because the ALJ is permitted to decide which factual picture is most probably true."  *Waddell v. Comm'r of Soc. Sec.*, No. 1:17-cv-1078, 2018 WL 2422035 at *10 (N.D. Ohio May 10, 2018), *report and recommendation adopted*, 2018 WL 2416232 (N.D. Ohio May 29, 2018).  *See also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The

20

substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.") (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Finally, Plaintiff maintains that the ALJ erred in "mainly focus[ing] on the opinion of Dr. Nusbaum in an attempt to distinguish it from Dr. Trapp's opinions." (Pl.'s Statement of Errors 12, ECF No. 11 at PAGEID # 1322.) A review of the ALJ's decision, however, reveals this assertion to be incorrect.

In summary, the ALJ offered good reasons for rejecting Dr. Trapp's opinions, and those reasons are supported by substantial evidence. Plaintiff's contention of error relating to the ALJ's evaluation of Dr. Trapp's opinions is therefore **OVERRULED**.

## B.     Substantial Evidence Supports the ALJ's RFC Determination.

The determination of a claimant's RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). An ALJ must explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (internal footnote omitted).

Within this contention of error, Plaintiff maintains that "although the ALJ purported to adopt Dr. Nusbaum's testimony, the residual functional capacity that ultimately appeared in the ALJ's written decision failed to include all of the limitations opined by Dr. Nusbaum." (Pl.'s Statement of Errors 14, ECF No. 11.) In particular, Plaintiff points out that as a result of Plaintiff's knee issues, Dr. Nusbaum opined that Plaintiff could not climb stairs and that his stooping, squatting, crouching, and crawling would be limited to less than occasional, defined as less than 10% of the time, yet the ALJ limited Plaintiff's climbing ramps, stairs, crouching, and kneeling to "no more than occasionally." (*Id.*; *see also* R. at 420 (finding Plaintiff to be *more* limited than Dr. Nusbaum opined in concluding that he could never crawl or climb ropes or scaffolds).) According to Plaintiff, "[t]he ALJ's error is not harmless" because "[w]hether or not an individual is able to perform these types of functions can have a significant impact on an individual's disability claim." (*Id.* at 16.)

Plaintiff's challenge to the ALJ's RFC determination fails for a number of reasons. Contrary to Plaintiff's assertion, the ALJ did not "purport[] to adopt Dr. Nusbaum's testimony." Rather, the ALJ's decision makes clear that she assigned Dr. Nusbaum's opinions "partial weight," with the exception of Dr. Nusbaum's opinions relating to whether Plaintiff satisfied Listing 1.02, which she assigned "significant weight." (R. at 424.) Moreover, the ALJ made clear that she adopted "most of the postural limitations Dr. Nusbaum assessed" and explained that she assigned "little weight" to the particular limitations Dr. Nusbaum opined that were more restrictive than the RFC she assessed because they were "inconsistent with and unsupported by the totality of the evidence . . . ." (R. at 425.) The ALJ then proceeded to discuss the evidence upon which she relied in making this determination. (R. at 425–27.) By way of example,

22

Plaintiff makes much of the fact that the ALJ declined to agree with Dr. Nusbaum's opinion that Plaintiff's right-knee issues prevented him from "stooping" more than 10% of the workday.  It is unclear, however, how Plaintiff's right-knee impairment would impact his ability to stoop given that "stooping" is defined as "bending the body downward and forward by bending the spine at the waist."  SSR 83-14, 1983 WL 31254, at *2.  The Court finds that in rejecting a stooping limitation, the ALJ reasonably pointed out that Plaintiff "repeatedly denied back and neck pain" and also reasonably observed that Plaintiff "engag[ed] in strenuous activities such as repairing tractors," as well as engaged in other activities of daily living such as caring for his elderly mother, caring for two cats and dogs, driving, and running errands.  (R. at 426.)

Even assuming the ALJ erred in neglecting to include all of the limitations Dr. Nusbaum opined in the RFC she assessed, contrary to Plaintiff's assertion, such an error would not warrant reversal in light of the VE's testimony, which the ALJ cited in her decision.  (*See* R. at 13, 445.)  In particular, the VE pointed out that with the limitations Dr. Nusbaum opined, Plaintiff could still perform his past positions of retail manager, marketing executive, vehicle sales, and marine sales as those positions were actually performed by Plaintiff.  (R. at 13.)  The ALJ noted this in her decision, adding that it appears that Plaintiff could also perform the marketing executive job as it is generally performed given that this particular position is generally performed at the sedentary level of exertion.  (*See* R. at 445.)

Finally, Plaintiff fails to acknowledge that in crafting Plaintiff's RFC, the ALJ offered a detailed discussion of the record evidence, which includes record citations to the evidence upon which the ALJ relied.  Plaintiff likewise fails to acknowledge that the ALJ considered and accorded "significant weight" to Dr. Hughes' opinions and only "partial weight" to the opinions of Dr. Das, which were much less restrictive than those of Dr. Hughes.  (R. at 98–100; 108–112;

23

and 423–24.)  Notably, the RFC the ALJ assessed was *more* restrictive than Dr. Hughes' opinion as to crouching, kneeling, and crawling.

In summary, the ALJ did not err in failing to incorporate all of Dr. Nusbaum's opined limitations.  Because substantial evidence supports the ALJ's RFC determination, Plaintiff's second contention of error is **OVERRULED**.

### VI.    DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, the Court Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner of Social Security's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE